## MACHINE TOOL & EQUIPMENT CORPORATION v. RECONSTRUCTION FINANCE CORPORATION.

### No. 9875.

Circuit Court of Appeals, Ninth Circuit.

Nov. 18, 1942.

Rehearing Denied Dec. 18, 1942.

548

Arthur A. Goldsmith, of Portland, Or., and Irwin Geiger, of Washington, D. C., for appellant.

.Russell L. Snodgrass, and Robert C. Goodale, Atty., R. F. C., both of Washington, D. C., and George R. Wilbur, Atty., R. F. C., of Portland, Or. (Claude E. Hamilton, Jr., Gen. Counsel, R. F. C., of Washington, D. C., and Brobeck, Phleger & Harrison, of San Francisco, Cal., and Robert E. Capers, of Portland, Or., of counsel), for appellee.

Before GARRECHT, HANEY and STE-.PHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Appellant, an Arkansas corporation, instituted the instant action in the Oregon state court against the Reconstruction Finance Corporation, a corporation existing under the laws of the United States (herein referred to as R. F. C.), seeking a decree declaring it to be the equitable owner of certain railroad materials, equipment and supplies, and requiring R. F. C. to transfer the legal title and possession to appellant upon the payment of the alleged agreed price of $32,453. The complaint alleged that R. F. C. had contracted to sell said property to the plaintiff for the sum of $32,453, and this is followed by a recital that equitable title to the property is in the plaintiff.

It is further alleged that R. F. C., by its course of conduct, induced the plaintiff-appellant to incur an expense of $5,075, and in addition thereto, caused the plaintiff's representative to spend an incalculable amount of time and energy in connection with the transaction.

There is an allegation that because of the studies, which plaintiff made of the property, and the manner of providing transportation therefor, and of its unique location, and because of the nature of plaintiff's business and its ability and efforts to find a market for said property, the property has a peculiar value to plaintiff, and in the event it is disposed of by R. F. C., plaintiff will suffer irreparable damage. [Our disposition of this case makes it unnecessary that the allegations of this paragraph be given consideration.]

It is alleged that R. F. C. has refused to transfer legal title to the plaintiff, and that plaintiff is ready, willing and able to pay the agreed purchase price thereof.

The action was removed to the United States District Court because it is one of a civil nature over which the United States District Court has original jurisdiction, in that it involves a controversy arising under the Constitution of the United States and the laws of Congress and within the monetary jurisdictional limitation thereof.[1] 28 U.S.C.A. §§ 71, 41(1), 42.

Judgment went for the defendant and plaintiff appeals.

We shall proceed to set out in brief the facts as found by the trial court, and upon which the plaintiff relies in urging that a binding contract was entered into between it and R. F. C.

In the so-called Tillamook Fire of 1939, a large forest of lumber timber tapped by the so-called Carlton & Coast railroad line was destroyed and the railroad itself was heavily damaged. Some of the rail-bearing trestles were burned out, a large number of the ties were destroyed, and a part of the railroad was rendered unusable.

An Oregon state court appointed J. G. Bourus receiver of the properties in question. At the time all the transactions involved in this case took place, and until April 29, 1941, the receivership continued, and the receiver was in possession and control of the assets and properties involved.

During the period of time within which the herein related events occurred, R. F. C. held first mortgages for a large sum of money upon some of the properties under receivership. The Bank of California held a first mortgage upon certain other properties of the railroad and affiliates and the Southern Pacific Company was the owner of some of the railway trackage and property which was used by the Carlton & Coast Railway Company and affiliates in the operation of their railroad and logging business.

Sometime prior to October, 1940, Messrs. Schwartz and Geiger, acting for the plaintiff in the instant action, on the one hand, and Senator Henderson, acting for R. F. C., on the other hand [Charles B. Henderson was a member of the Board of Directors of R. F. C. throughout these proceedings. He is referred to as "Senator Henderson".], held a conference in Washington, D. C., in which it was suggested that Mr. Schwartz look into the matter of the salvaging of the Carlton & Coast Railroad properties. Thereafter, Mr. Hamilton, acting for R. F. C., sent inventories of the personal property of the Carlton & Coast Railway to Messrs. Geiger and Schwartz, and invited them to study the matter.

Plaintiff then sent a representative to Oregon to make a preliminary survey of the properties. Senator Henderson had told the plaintiff that in working out a salvage offer, it would be necessary to co-operate with the Bank of California and the Southern Pacific Company, and arrange an equitable basis for the purchase of their respective metals, or arrange to transport them to Carlton, Oregon.

At this time, and at all times, it was the belief of the parties that the rehabilitation and use of the Carlton & Coast Railroad line was necessary to the economical salvaging of part of the personal property involved herein, to the salvaging of the personal property on which the Bank of California held a first mortgage, and to the salvaging of the railroad metals owned by the Southern Pacific Company.

On October 3, 1940, a meeting was held, at which there were present, Senator Henderson, Mr. Hamilton, and one other person, representing R. F. C., and Messrs. Schwartz and Geiger, representing the plaintiff herein. At that time, on behalf of

---

[1] The petitioner being a corporation created by Act of Congress, and all of its capital stock being owned and held by the United States of America.

plaintiff, an oral offer was made to purchase the larger portion of the personal property now in suit for $29,000. This price was in general acceptable to R. F. C. However, R. F. C. desired to protect the interests of Southern Pacific Company and Bank of California, and this, together with agreement as to price of some additional materials, was left to further consideration.

On the next day, October 4, 1940, Mr. Geiger wrote to R. F. C., as follows:

"This letter confirms the understanding arrived at yesterday at our conference with you in your office respecting the proposal of my clients, the Machine Tool & Equipment Corporation, to purchase certain property of the Carlton & Coast Railroad Company and Affiliated companies which are subject to the lien of a mortgage held by the Reconstruction Finance Corporation.

"This arrangement is as follows:

"(1) The Machine Tool & Equipment Corporation, or its nominee, shall pay the Reconstruction Finance Corporation, or its nominee, the sum of $29,000.00 for all track metals, rolling stock and equipment of the Carlton & Coast Railroad Company and affiliated companies which are subject to the lien of the Reconstruction Finance Corporation mortgage. According to the estimate of Mr. Jesse Bourus, the Receiver, which we accept as conclusive, this item comprises 5800 gross tons.

"(2) We also agree to purchase at prices to be agreed upon with Mr. Bourus, acting for the Reconstruction Finance Corporation, all small tools, metal stocks and miscellaneous store stock items which are subject to the lien of the Reconstruction Finance Corporation mortgage. These are in addition to and not included in the tonnage of track metals, rolling stock and equipment referred to in the preceding paragraph.

"(3) Payment for all of the foregoing included in paragraphs 1 and 2 shall be made by the Machine Tool & Equipment Corporation, or its nominee, to the Reconstruction Finance Corporation, or its nominee, contemporaneous with the delivery of such title as the Reconstruction Finance Corporation receives or is entitled to receive.

"(4) The Machine Tool & Equipment Corporation, or its nominee shall have free storage for a reasonable time at the terminus of the Carlton & Coast Railroad Company at Carlton, Oregon.

"(5) If the foregoing correctly summarizes our understanding, will you kindly endorse the enclosed copy and return it to me.

"Thanking you for your gracious reception yesterday, I am,
"Yours very truly,
"Irwin Geiger,
"Attorney for Machine Tool & Equipment Corporation."

Following the conference of October 3, 1940, Mr. Geiger, representing the plaintiff, made a trip to Oregon, and at the request of Senator Henderson of R. F. C., began negotiations with the Bank of California and the Southern Pacific Company.

On October 5th, Senator Henderson replied to the letter of Mr. Geiger, which we have quoted above, as follows:

"Receipt of your letter of October 4, 1940, is acknowledged.

"As you will recall, our discussion of the acquisition by your client of the properties underlying mortgages of Flora Logging Company and Carlton & Coast Railroad Company, held by this Corporation, was necessarily predicated upon the acquisition of title to those properties by this Corporation. At such time as this Corporation is in a position to negotiate directly for the sale of such properties, the offer made by your client will be submitted to this Corporation's Board of Directors by our Railroad Division, with its recommendation."

On November 5th, Mr. Geiger wrote R. F. C., as follows:

"Since receipt of your letter of October 5th regarding the disposition of the Carlton & Coast Railroad salvage we have been on the ground and made a thorough investigation of the entire matter. Receiver Bourus advises that all of the outstanding claims against the Receivership estate have now been acquired. Accordingly, the deal which we negotiated with you, as outlined to you in my letter of October 4th, is as we understand it now ready for consummation.

"In conformity with our arrangement with you, we have implemented this arrangement in personal conferences at Portland, as follows:

"1. Mr. Bourus has fixed a valuation of $2,500.00 as the price which we agree to pay for the miscellaneous store stock at Carlton.

"2. We have negotiated arrangements with Mr. Bourus to assume the responsi-

bility for dismantling both for us, as well as the metals belonging to the Bank of California and to the Southern Pacific Railroad which has marooned trackage in territory contiguous to the Carlton & Coast Railroad.

"3. We have worked out a formula with the Bank of California for cooperatively sharing the expense of salvaging which will enable all interested parties to protect such interests as they may have in their respective properties through us.

"The total consideration owing from us to the Reconstruction Finance Corporation is $31,500, consisting of $29,000 for all track metals, equipment and rolling stock of the Carlton & Coast Railroad Company and affiliated companies, subject to the lien of the RFC Mortgage, and $2,500 as determined by Mr. Bourus for the miscellaneous inventory not included therein. The sum of $31,500 we are prepared to pay in cash upon confirmation by the RFC of the sale of its interest in the foregoing property to us.

"We are extremely anxious to conclude the transaction at the earliest possible date because of the increase in the cost of salvage as the season progresses, and because of the time element involved in speculative scrap markets, particularly in the Pacific Northwest.

"You will be interested to know that the $5.00 figure for dismantling as originally computed by Mr. Bourus has been revised upward by him to approximately $7.00. This added cost factor which we are absorbing only emphasizes the necessity for a speedy conclusion to conserve cost and minimize risks to the greatest possible extent."

In reply to this letter, Mr. Henderson, on November 12, 1940, wrote Mr. Geiger:

"This will acknowledge receipt of your letter of November 5, 1940, renewing your client's offer to purchase such of the track metals, equipment, rolling stock and miscellaneous store stock of Carlton & Coast Railroad Company and affiliated companies as may be subject to the liens of mortgages of those companies held by this Corporation, as first liens, at a price of $31,500, payable upon the transfer to your client of such title to such property as this Corporation may have.

"In order that the terms of your client's offer may be fully understood by this Corporation's Board of Directors, when the same is presented for your consideration, it is suggested that you restate it, embodying a description of the properties contemplated to be purchased such as will be satisfactory to your client when contained in the bill of sale which will be delivered by this Corporation in the event your client's offer is accepted."

Accordingly, on the next day, November 13th, Mr. Geiger restated the terms of the plaintiff's offer as follows:

"In conformity with your suggestion of November 12, I am restating the terms of our offer as set out at length in my letter of October 4 confirming our negotiations of the preceding day and as amplified in my letter of November 5, including a detailed description of the property to be acquired, viz:

"The Machine Tool & Equipment Corporation, or its nominee, will pay to the Reconstruction Finance Corporation the sum of $31,500.00 for all right, title and interest which the Reconstruction Finance Corporation has or to which it may be entitled in all rail, track metals and material, rolling stock, equipment, shop tools and machinery, supplies and shop equipment, miscellaneous store stocks and all other personal property of the Carlton & Coast Railroad, the Flora Logging Company and affiliated companies under and by virtue of the liens of Reconstruction Finance Corporation as mortgagee of said companies. Said property is more particularly, but without limitation, described as follows:

[Here is inserted particular description of the property which is the subject of this action].

"The entire purchase price shall be payable upon delivery by the Reconstruction Finance Corporation of a bill of sale conveying said property described as above. The items enumerated in the foregoing description were supplied by Mr. Jesse Bourus, Receiver, in an inventory prepared by him.

"To the extent of its right and power in the premises, the Reconstruction Finance Corporation consents that the purchaser shall have free storage for a reasonable time at the terminus of the Carlton & Coast Railroad Company at Carlton, Oregon.

"If it is feasible, my clients would prefer if the bill of sale recited a nominal consideration."

A further conference between the above-named individuals, respectively represent-

ing the parties to this action, was held on November 25, 1940, at which time a written inventory of all property involved in this action, on the letterhead of R. F. C., was distributed by Mr. Hamilton to the plaintiff and Senator Henderson, showing the values of the various items of property, as estimated by the receiver; and the plaintiff, at the request of R. F. C., and in accordance with such written inventory, increased its offer for all of such property to $32,453.

On or about January 15, 1941, the receiver was in Washington, D. C., and conferred with officials of R. F. C. Thereafter, Mr. Hamilton presented the following memorandum to the Executive Committee of R. F. C.:

"January 15, 1941 .

"Memorandum for the Directors:

"Re: Carlton & Coast Railroad Loan.

"In December, 1932, Carlton and Coast Railroad Company, operating in the Tillamook forest section of Oregon, secured a loan from Reconstruction in the amount of $549,000. The unpaid balance of this loan as of today is $394,103, and accrued unpaid interest as of January 1, 1941, amounted to $14,744.00.

"Two forest fires, one in 1933 and the other in 1939, have completely wiped out the timber tributary to the railroad, and destroyed portions of the railroad property itself. Practically all of the bridges in the railroad have been destroyed.

"For the protection of Reconstruction's interests, the property was placed in receivership on January 13, 1940, Mr. J. G. Bourus of Portland, Oregon, being appointed Receiver by the Circuit Court of Multnomah County.

"Realizations from insurance cover on the destroyed bridges in the amount of $28,090.69 were collected by Reconstruction, and applied to the payment of principal of and interest on the loan.

"Upon application of the Receiver, the Interstate Commerce Commission has granted authority to abandon operation of the property.

"RFC holds a mortgage upon all the property of the Carlton and Coast Railroad, and, in support of a guaranty of the railroad loan by Flora Logging Company, the sole stockholder, holds also a mortgage upon a substantial portion of the logging railroad, and other property of Flora Logging Company and its operating representative, the Flora Corporation.

"The Receiver has secured assignments of all of the unsecured claims at two cents on the dollar, and the secured claims other than that of Reconstruction are to be satisfied by transfer of title to the property on which lien is held.

"A portion of the property of Flora Logging Company which is not mortgaged to Reconstruction is under mortgage to the Bank of California, which proposes to take title to the property on which it has a lien, and withdraw from the receivership proceedings.

\* \* \* \* \* \*

"Receiver is now ready to dispose of the physical assets on which Reconstruction has liens. In October, 1940, the Machine Tool and Equipment Corporation of New York, New York, and Fort Smith, Arkansas, made offer to purchase all of the metals, equipment and miscellaneous store stock of Carlton and Coast Railroad, Flora Logging Company, and Flora Corporation, on which Reconstruction has a lien, for the sum of $32,453, to be paid by certified check to the order of the Receiver upon passage of title to these materials and equipment. It was the recommendation of the Railroad Division at that time that this offer be accepted by Reconstruction, and the Receiver be requested to recommend its acceptance to the Court. Passage of title was not feasible at that time, as there were other claims outstanding against the estate. These will all have been disposed of in a few days, and Reconstruction will remain the sole creditor.

"The Receiver is of the opinion that the offer is satisfactory, and should be accepted. The Railroad Division so recommends, and asks the Board's approval; also that the Secretary be requested to write a letter to the Receiver, outlining this approval, said letter to be the basis of the Receiver's recommendations to the Court.

"As a condition, however, to the sale, a firm commitment should be exacted from the purchaser, agreeing to protect the Bank of California and the Southern Pacific Railroad in the removal of certain materials of their lien and ownership, which are marooned in the vicinity, and which can only be economically salvaged by using the Carlton and Coast Railroad, which the purchaser must agree to rebuild sufficiently to get all of the metals involved out to Carlton, Oregon, where they can be shipped

over the Southern Pacific Railroad; the cost of this operation to be equitably prorated on basis of the service rendered.

"The Secretary's letter should convey to the Receiver Reconstruction's desire that the metals mentioned herein be sold at private sale, as counsel advises that only in that way can the protection for the Southern Pacific and the Bank of California above referred to be properly and safely implemented.

\* \* \* \* \* \* \*".

The minutes of the Executive Committee[2] of January 15th show that the Committee approved the recommendation contained in the foregoing memorandum, and authorized the Secretary to send the following letter to the receiver:

"The Directors of this Corporation have instructed me to advise you that inasmuch as other creditors of your receivership may, as you have pointed out, be prejudiced by the presently proposed separate sale at public outcry of the materials and equipment described in the list which you have furnished us, underlying the mortgages held by this Corporation, it is felt desirable that you should request the Court to recall his authority for the holding of such sale.

"At the same time, it is requested that you seek authority of the Court to accept, as Receiver, an offer which has been made directly to this Corporation by Machine Tool and Equipment Corporation for the purchase of the materials and equipment described in the list which you have furnished us at the price of $32,453.00. Their offer has been made to us, and our willingness to accept it is conditioned upon Machine Tool and Equipment Corporation agreeing to permit the use of the railroad lines involved, by other creditors of this receivership in their salvage operations, upon payment of an equitable share of the total cost of such use, as determined by you.

"Our counsel in Portland will be instructed to advise the Court, when your petition is brought on for hearing, that this Corporation is agreeable to such sale on the terms mentioned, which will be worked out in detail to the satisfaction of your counsel."

On January 16, 1941, the Secretary of R. F. C. wrote the above letter to Mr. Bourus, as receiver, in accordance with the Board's instructions of the preceding day. The letter was personally delivered to Mr. Bourus, who exhibited it to Mr. Geiger, acting for plaintiff. Mr. Geiger was also notified by Mr. Hamilton that the Board of R. F. C. had approved the recommendation. In this connection, Mr. Geiger's uncontradicted testimony is as follows: "He [Mr. Hamilton] called me and said that the day before he had had Mr. Bourus in conference with Senator Henderson, that they had gone over the whole situation pertaining to our deal and the Carlton & Coast generally, and that the Senator had told him to present the matter for report to the Board on that morning, on the following day—that meant January 15th, the same day that he called me—and that he had been before the Board that morning and had presented a report, the Board had approved the deal and had directed a letter to be written to Bourus implementing the deal, subject to a condition, that condition being that the Receiver get from us a letter of commitment that we would remove the property of The Bank of California and the Southern Pacific on an equitable basis, substantially what we had previously agreed to do when I was out in Portland. He also said to me 'You had better get Mr. Schwartz down here tomorrow and get your check in, have him bring a check with him, because I am sending the Receiver over to your office to get that commitment, which is a condition of the acceptance by the Board in its action this morning'."

On the same day, and after Mr. Bourus had exhibited the letter to Mr. Geiger, the latter wrote the following letter to the receiver:

"In conformity with the terms of the deal between the Machine Tool and Equipment Corporation and the Reconstruction Finance Corporation for the sale to the Machine Tool & Equipment Corporation for the sum of $32,453 of the metals, material and equipment enumerated in your inventory \* \* \* this letter confirms our commitment to you, as receiver, and the Reconstruction Finance Corporation that my clients will undertake to pick up, remove and lay down at Carlton the metals and equipment of the Southern Pacific

---

[2] The actions of the Executive Committee of R. F. C. have the same legal effect as actions by the whole Board, according to the findings of the trial court, and R. F. C. has raised no issue in this case that the action of January 15, 1941, was of the Executive Committee as distinguished from the Board.

Railroad and the Bank of California (including the Trask-Williamette Company's property) upon the following terms and conditions:

"(1) Payment to my clients of an equitable proportion of the over all cost of rehabilitation, dismantling, removal and transportation to storage in Carlton;

"(2) Space at Carlton contiguous to the Track of the Carlton & Coast Railroad be made available by the Southern Pacific Railroad Company and The Bank of California without cost to my clients for the delivery and storage of their metals and equipment;

"(3) My clients may utilize, without cost or charge to them, any equipment or facilities now on the property belonging to the Bank of California (including the Trask-Williamette Company's property) or the Southern Pacific Railroad which my clients deem necessary or advisable in effecting the rehabilitation, removal, transportation and storage of said metals and equipment. .

"It is my understanding that you will submit this commitment to the Court of Jurisdiction for its consideration. Upon advice from you that the requisite deed or bill of sale is available for delivery to the Machine Tool & Equipment Corporation, I will deliver to you a certified check in the sum of $32,453.00, and will thereupon, on behalf of my clients, enter into engagements with the Bank of California and the Southern Pacific Company implementing the foregoing commitment respecting their metals."

Both prior to January 15, 1941, and thereafter, up to April 30, 1941, plaintiff was in frequent touch with representatives of R. F. C., requesting title to the property and possession thereof, and plaintiff was frequently assured that steps were being taken to obtain title. At no time between said two dates was any intimation made by R. F. C. to plaintiff that there was no agreement between them concerning the sale of said property, or that plaintiff had not sufficiently complied with the commitment required as to the Bank of California or Southern Pacific Company.

On March 31, 1941, the Board of Directors of R. F. C. met and were presented with a report from Mr. Barriger, Chief of the Railway Division of R. F. C., which recited,

"At a meeting of the Directors on January 15, 1941, the Directors authorized the Secretary of the Corporation to send a letter to Mr. Bourus, Receiver of the Carlton & Coast Railroad Company, asking the Receiver to request the Court to cancel the public sale which had been ordered by the Court of materials and equipment subject to the lien of the mortgages held by RFC and at the same time to ask authority from the Court to accept, as Receiver, an offer made by Machine Tool and Equipment Corporation for the purchase of such property at the price of $32,453, which offer included an agreement on the part of the Machine Tool and Equipment Corporation to permit the use of the railroad lines involved by other creditors (principally the Bank of California and the Southern Pacific Company) in their salvage operations, upon payment of an equitable share of the total cost of such use, as determined by the Receiver.

"We are advised that after the receipt of this letter the Court, upon request of the Receiver, cancelled the public sale and on its own motion entered an order directing the Receiver to file a report with the Court as to rumors that the property in question could be sold at a greater price than named in the offer of the Machine Tool and Equipment Corporation.

"Such report having not yet been filed with the Court and representations having been made to the Corporation by its Portland counsel handling the matter locally that sale to the Machine Tool and Equipment Corporation on the terms above mentioned 'would be likely to result in RFC'S recovery from its collateral being substantially less than would probably be produced should the collateral be liquidated in the usual way, either by separate sales of the collateral of the several secured creditors, or by sale of Bank of California's collateral and ours at the same time, to the same bidder', and RFC being further advised by its aforesaid Portland counsel that Mr. Morris, counsel for the Receiver, agrees with this view, it is recommended that Mr. Kennedy, Manager of RFC's Portland Loan Agency be instructed upon his return to Portland to discuss the whole matter of liquidating RFC's security with the Court and to advise the Court that RFC wishes to leave to the Court's best judgment the method of the sale of the equipment and materials in question for the Court to determine the procedure to be

followed which will result in the largest possible realization to RFC without injustice being done to other secured creditors of the receivership.

\* \* \* \* \* \*".

The Board approved the recommendations contained in the memorandum.

On April 29, 1941, a receivership sale of the property in question was had, at which R. F. C. bid in the property.

The next day, on April 30, 1941, R. F. C. wrote plaintiff a letter, stating that R. F. C. had no agreement with the plaintiff for the sale of any of the assets of Carlton & Coast Railroad Company, Flora Logging Company, or Flora Corporation.

The receivership court confirmed the sale to R. F. C. on May 21, 1941. Plaintiff objected to the confirmation, but the receivership court dismissed its motion without prejudice to its right to bring this present suit. The instant action followed.

Upon the basis of the above facts, the trial court found: "The Court finds that the minutes of Reconstruction of January 15, 1941, and the letter of Reconstruction's Secretary to receiver Bourus written January 16, 1941, would have constituted a sufficient memorandum so far as the Statute of Frauds is concerned if all of the terms of the agreement had been included therein. Inasmuch as plaintiff took the position that there were further terms of an agreement which were not included in said writings (that is, in said minutes of Reconstruction's Board and in said letter of Reconstruction's Secretary to the receiver), and such other terms are nowhere incorporated in any writing subscribed by Reconstruction or by any authorized agent of Reconstruction, the Court finds that the minds of the parties had not met upon the terms of an agreement, particularly with reference to the protection of Southern Pacific Company and the Bank of California in reference to properties on which said corporations had liens, respectively. Therefore, there is no agreement between the parties, the terms of which are evidenced by a writing, or series of writings, subscribed by Reconstruction or by an authorized agent thereof."

Of course, if there was no enforceable contract between the parties, plaintiff's action must fail. The question, therefore, for our immediate consideration is whether or not the trial court erred in finding that the parties had not reached a full agreement, and if the court did so err, whether or not there was a sufficient memorandum thereof to satisfy the statute of frauds [Section 2-909, Oregon Compiled Laws, Annotated].

In this connection, the trial court found, and the finding is supported by the evidence, that prior to January 15, 1941, no valid agreement had been reached between the plaintiff on the one hand, and R. F. C. on the other hand, for the purchase and sale of the property in question. Therefore, in seeking the solutions of the problems, we look to the events occurring on and subsequent to the last-mentioned date.

The plaintiff contends, and R. F. C. denies, that the action of the Executive Committee on January 15th constituted an acceptance of plaintiff's offer to purchase the material in question for the sum of $32,-453. The argument is built up as follows:

That, as shown by the letter from R. F. C. to Mr. Bourus of date of January 15, 1941, and the report submitted to the Directors of R. F. C. on March 31, 1941, plaintiff's offer was made "conditioned upon Machine Tool and Equipment Corporation agreeing to permit the use of the railroad lines involved, by other creditors of this receivership in their salvage operations, upon payment of an equitable share of the total cost of such use, as determined by [Mr. Bourus]"; that since this was a part of plaintiff's offer and of R. F. C.'s acceptance, the so-called "condition" stated by R. F. C. in its resolution and in its letter to Mr. Bourus added nothing, and hence, did not convert the "acceptance" into a counter-offer.

Let us examine, therefore, the condition stated by R. F. C. in its resolution and letter referred to.

The resolution approved the recommendations contained in the report to the Executive Committee, which recited that as a condition to the sale, "a firm commitment should be exacted from the purchaser, agreeing to protect the Bank of California and the Southern Pacific Railroad in the removal of certain materials of their lien and ownership, which are marooned in the vicinity, and which can only be economically salvaged by using the Carlton and Coast Railroad, which the purchaser must agree to rebuild sufficiently to get all of the metals involved out to Carlton, Oregon, where they can be shipped over the South-

ern Pacific Railroad; the cost of this operation to be equitably prorated on basis of the service rendered".

Plaintiff urges that since the court found that throughout the transactions between the parties hereto, it was the belief of the parties that the rehabilitation and use of the Carlton & Coast Railroad line was necessary to the economical salvaging of part of the property, the subject of this action, and also, to the salvaging of the railroad metals owned by the Southern Pacific Company, and since there is undisputed evidence in the record to the effect that the minds of the parties had met upon an agreement that any deal worked out between the parties would involve an obligation on the part of the plaintiff to remove on an equitable sharing of the costs, the property of the Southern Pacific Company and the Bank of California,[3] it necessarily follows that the requirement of R. F. C. that the plaintiff agree to rebuild the Carlton & Coast Railroad "sufficiently to get all of the metals involved out to Carlton, Oregon" added nothing, or in other words, that it was not a "new condition".

■■ That an acceptance of an offer is not rendered insufficient to consummate a contract, by a condition which would be implied in fact or by law, is recognized by a number of authorities. However, it is our opinion that the condition inserted by R. F. C., to the effect that the plaintiff must agree to rebuild the railroad, is not a condition which would be implied in fact or by law from an agreement that the plaintiff would remove the property of the Southern Pacific Company and Bank of California on an equitable sharing of the costs.

■ The law of Oregon, where this case arose, and where the contract was to be performed is clearly defined. We quote from Ellingsworth v. Shannon, 161 Or. 106, 88 P.2d 293, 294, 295: "An acceptance must be in the precise terms of the offer. If, as here, a new provision is suggested, the answer is merely a counter offer and until that has been assented to by the one making the original offer, there is no meeting of the minds and hence no contract. [Citing many Oregon cases.]"

But, urges the plaintiff, there is nothing in the testimony to indicate that the requirement as to the rebuilding of the railroad was the condition of the acceptance as communicated to the plaintiff. The Executive Committee instructed the Secretary to write to Mr. Bourus, instructing him to seek authority of the court to accept the offer of the plaintiff "conditioned upon Machine Tool and Equipment Corporation agreeing to permit the use of the railroad lines involved, by other creditors of this receivership in their salvage operations, upon payment of an equitable share of the total cost of such use, as determined by you [Mr. Bourus]." This is the letter that was shown to plaintiff's representatives. If this were all, there might be some merit to plaintiff's argument that there was no new condition inserted by R. F. C. However, as we have shown above, Mr. Hamilton in notifying Mr. Geiger, plaintiff's representative, of the Committee's action, stated that the action of the Committee was "subject to a condition, that condition being that the Receiver get from us [plaintiff] a letter of commitment * * *".

■ We are convinced that the Oregon court would hold that this requirement insisted upon by R. F. C., even disregarding the requirement that the plaintiff agree to rebuild the railroad, would constitute a new condition so as to convert R. F. C.'s action into a counter-offer.

The question then arises, Was this counter-offer ever accepted by the plaintiff? Plaintiff insists that if the action of the Executive Committee was merely a counter-offer, then the action of plaintiff in furnishing the receiver with the letter of commitment on January 16, 1941,

---

[3] Mr. Hamilton, R. F. C.'s witness, and the person with whom the plaintiff's representatives dealt in negotiating for the purchase of the property involved in this action, testified as follows on cross-examination:

"Q. And in these conferences with Mr. Schwartz and myself [Mr. Geiger] preceding the October 3rd meeting we had * * * also agreed with you, in response to what you expressed was the wish of the Corporation, of the R. F. C., that any deal we made with the R. F. C. would be so conditioned that it would involve an obligation by us to equitably remove, or remove on an equitable sharing of the costs, the property of other persons interested behind the R. F. C., up above, the Bank of California and the Southern Pacific? A. Yes, the property which would be marooned, speaking railroad-wise, if these rails were taken up.

"Q. And we had agreed to do that? A. Yes, sir."

together with the tender of the certified check for the amount of the agreed purchase price, must be construed as an acceptance of the counter-offer.

But let us examine the letter referred to.

Not one word is contained in the letter regarding the obligation of plaintiff to rebuild the railroad, but we do not base this opinion upon this point, in view of plaintiff's insistence that this requirement was not a part of the acceptance of R. F. C. as communicated to plaintiff. It will be recalled that the letter of R. F. C. to Mr. Bourus, which was shown to plaintiff, stated that the condition was that plaintiff should agree "to *permit the use* of the railroad lines involved, by other creditors of this receivership in *their* salvage operations, upon payment of an equitable share of the total cost of such use as determined by you [Mr. Bourus]". Plaintiff's reply to this, upon which it relies as an acceptance, states the agreement to be that the plaintiff would undertake to remove the property upon payment of an equitable proportion of the all over cost of rehabilitation, etc. This, it will readily be seen, is entirely different from an agreement to permit the other creditors to use the railroad lines in *their* operations.

There are also other provisions in the letter which would be implied in fact or by law from the counter-offer of R. F. C., such as the requirement that plaintiff "may utilize, without cost or charge * * * any equipment or facilities now on the property belonging to the Bank of California * * * or the Southern Pacific Railroad which [plaintiff] deem[s] necessary or advisable in effecting the rehabilitation, removal, transportation and storage of said metals and equipment".

 We feel compelled to hold that plaintiff's letter, if communicated to R. F. C., would constitute merely another counter-offer, rather than an acceptance of R. F. C.'s offer.

■■ There is nothing in the record to indicate any action on the part of R. F. C. subsequent to this date which could possibly be interpreted as an acceptance of plaintiff's new counter-offer. It should here be noted, however, that plaintiff requested and was refused permission by the trial court to reopen the case in order to show that the "letter of commitment", which was furnished Mr. Bourus, was read by plaintiff's representatives to Mr. Hamilton over the telephone, and that Mr. Hamilton stated that the letter was "satisfactory in every respect and was completely consistent with our prior understanding and conformed in all respects to the resolution of the Board of Directors". Plaintiff states that the refusal of the trial court to reopen the case to allow this testimony was an abuse of discretion. We see no error, even assuming that such action of the trial court may be assigned as error, for the following reason:

Assuming that it could be said that Mr. Hamilton accepted plaintiff's offer over the telephone, we would be met with the defense of the statute of frauds. Here were new terms of an alleged agreement which were not incorporated in any writing signed by R. F. C. It would avail plaintiff nothing to show that Mr. Hamilton had orally agreed to the provisions of plaintiff's letter to Mr. Bourus.

Finding no error, the decision of the trial court is affirmed.