**THE CENTRAL NATIONAL BANK IN CHICAGO**

v.

**RECONSTRUCTION FINANCE CORPORATION.**

No. 52 C 2121.

United States District Court N. D. Illinois.

July 13, 1955.

Paul W. Tatge, Gerhardt S. Jersild, Chicago, Ill., for plaintiff.

R. J. Thompson, Chicago, Ill., for defendant.

HOFFMAN, District Judge.

■ This is an action by The Central National Bank in Chicago against the Reconstruction Finance Corporation for breach of contract. Federal jurisdiction rests upon the ownership by the United States of the entire capital stock of the Reconstruction Finance Corporation, the requisite jurisdictional amount being involved. The statute creating the RFC and amendatory legislation provided that all of its stock be held by the United States Government, 15 U.S.C. § 601, 15 U.S.C.A. § 601. Any suit by or against the RFC is therefore a suit arising under the laws of the United States within the meaning of 28 U.S.C. § 1331. Machine Tool & Equipment Corp. v. Reconstruction Finance Corp., 9 Cir., 1942, 131 F.2d 547, 549; Marks v. Reconstruction Finance Corp., 4 Cir., 1942, 129 F.2d 759, 760.

■ The complaint herein cites only 28 U.S.C. § 1349 as the basis for jurisdiction in this suit. This section provides:

"The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."

While, strictly speaking, the foregoing section is a limitation upon jurisdiction rather than a grant of jurisdiction, Fields v. Community Federal Savings & Loan Ass'n, D.C.Mo.1941, 37 F.Supp. 367, the failure to cite the correct section of the Federal Judicial Code is immaterial where, as here, it is clear from the face of the complaint that federal jurisdiction exists. Prior to the enactment of 28 U.S.C. § 1349 any suit against a federal corporation was held to be a suit arising under the laws of the United States for purposes of federal jurisdiction. Osborn v. United States Bank, 1824, 9 Wheat. 738, 817, 828, 6 L.Ed.

204; Union Pac. R. Co. v. Myers, 1885, 115 U.S. 1, 2, 5 S.Ct. 1113, 29 L.Ed. 319; Matter of Dunn, 1909, 212 U.S. 374, 383–384, 29 S.Ct. 299, 53 L.Ed. 558. The enactment of 28 U.S.C. § 1349 does not alter the legal basis of federal jurisdiction over federal corporations where more than half of its stock is owned by the United States.

The contract upon which the Bank here brings suit is a printed, standard-form document known as the "Blanket Participation Agreement" which the RFC made available to banks generally throughout the country beginning in March 1945. The Bank alleges that the RFC breached this Agreement by refusing to purchase a 75% participation in a loan which the Bank made to the Kungsholm Baking Company and on which the Bank sustained a loss of approximately $135,000. The RFC justifies its refusal to purchase the participation in this loan on the ground that it was only obligated to purchase participations in loans which were secured by "validly pledged collateral having an appraised value (deemed reasonable by Bank) in excess of the unpaid balance" prior to any disbursement on the loan. The Bank concedes that the steps necessary to perfect the validity of the mortgages which were to secure the loan were not completed prior to the Bank's disbursement thereon. The Bank, however, claims that the loan was validly secured by adequate collateral prior to the date upon which it made demand on the RFC for the purchase of a participation and that this was sufficient.

The issues for decision here are these: First, whether the loan to Kungsholm was secured by validly pledged collateral prior to the disbursement thereon. Second, if it was not, whether it is a condition precedent to the obligation of the RFC to purchase a participation that the loan be validly secured prior to disbursement by the Bank thereon. Third, whether the Bank ever had an appraisal deemed reasonable by the Bank showing the value of the collateral to be in excess of the disbursement on the loan.

The Blanket Participation Agreement between the Bank and the RFC was signed December 12, 1945. The parties made no alterations in the standard printed form but merely inserted in the appropriate blank spaces the date of the execution of the agreement, the name of the Bank, the date of December 31, 1945, as the termination of the first quarter for which the recurring quarterly participation charge was due from the Bank to the RFC, and the signature of the parties.

The Blanket Participation Agreement was introduced to banks and business concerns by the issuance by the Reconstruction Finance Corporation of its Circular No. 25. The Bank attached a copy of this circular to its complaint and relies upon it for its interpretation of the Blanket Participation Agreement. The circular was issued on March 25, 1945, and bore the heading "Information Regarding Blanket Participation In Loans Made By Banks to Business Enterprises." This circular contains a page and a half explanation of the purpose and intent of the Agreement, a copy of the form of Agreement and excerpts from "Acts of Congress Applicable to Loans of the Character Herein Described." The purpose and intent of this Blanket Participation Agreement is set forth as follows:

"Reconstruction Finance Corporation has adopted a program which in effect provides for a practically automatic guaranty of 75% (or such lesser percentage as may be requested by the bank) of loans made by approved banks to business enterprises which meet the requirements of the Blanket Participation Agreement set forth on pages 2 to 6 of this Circular. Under this program, such loans would be made by banks upon terms and conditions satisfactory to them without the necessity of filing loan applications with the R.F.C. as heretofore.

"This action has been taken in order to adequately and promptly care for the large volume of applications for loans which it is anticipated may develop during and subsequent to the period of conversion from a wartime to a peacetime economy.

\* \* \* \* \* \*

"It is and always has been the policy of the Corporation to carry on its business in a manner which fosters private enterprise and avoids competition with banks. It is in furtherance of this established policy that the plan herein described has been made available to banks and industry.

"In order to qualify for protection under this new arrangement, a bank will make application for a Blanket Participation Agreement \* \* \* (If) approved the Agency Manager will execute the Agreement.

"Thereafter, a bank desiring to make a loan under the protection of the Agreement will first submit to the Agency Manager a schedule of the salaries and other compensation of the officers \* \* \* of proposed borrower \* \* \* If such \* \* \* are found \* \* \* to be reasonable and the proposed loan meets the requirements of the Agreement it will automatically be covered by the Agreement upon notice to the Loan Agency on a simple one page form.

\* \* \* \* \* \*

"\* \* \* · The simplicity of this procedure and the fact that the handling of the loan is in the bank's hands make it very attractive to banks desiring this service."

The Blanket Participation Agreement provided that the Bank, immediately upon making any loan as to which it desired the protection of the Agreement, should send the RFC a written notice, on a form supplied by the RFC, of the percentage of participation, not in excess of 75%, designated by the Bank, together with such other information respecting the loan as might be requested by the RFC. The Agreement further provided that thereafter the Bank should pay the RFC a participation charge of

three-fourths of one per cent per annum on all loans on which it had designated the participation of the RFC as in excess of 50% of the loan and furnish the RFC with monthly reports of payments of principal and interest on the loans.

The Agreement did not require the RFC to indicate any acceptance of loans nor to sign any guaranties nor to advance any funds unless the Bank should call upon it to purchase a participation in one or more of the loans protected by the Agreement. The Agreement did however obligate the RFC to purchase for cash from the Bank the designated percentage of participation upon ten days' written demand given at any time not later than 60 days after maturity of the loan, provided the loan was of the proper type and met the conditions listed in the Agreement. If the RFC purchased a participation, the RFC then became subject to a provision in the Agreement requiring it to share with the Bank any loss on the loan in the proportion of its participation.

The language of the Agreement respecting the securing of loans by collateral appears in the following context:

"3. * * * RFC will * * purchase for cash from Bank * * provided:

"(a) At the time of the first disbursement on account of such loan Bank received a statement of Borrower's financial condition * *

"(b) At the time of the first and each subsequent disbursement * * * Bank received evidence * * * that there has been no adverse change * * * in Borrower's financial condition, * * *

"(c) No disbursement was made by Bank on account of such loan unless such loan was secured by validly pledged collateral having an appraised value (deemed reasonable by Bank) in excess of the unpaid balance of amounts previously disbursed on account of such loan and the amount then to be disbursed.

"(d) RFC Agency Manager promptly received reports and notice * * * as provided * *

"(e) No part of the proceeds of such loan was used directly or indirectly in payment of indebtedness of Borrower to Bank incurred prior to the making of such loan * *."

Operating under this Blanket Participation Agreement, the Bank made in all some $3,125,000 of loans on which it sought and obtained the protection of the RFC. We are here concerned with only one of those loans, that made by the Bank on June 27, 1946, to the Kungsholm Baking Company. The Bank promptly designated the loan to Kungsholm as one on which it desired the protection of the Agreement. It did so by sending to the RFC on June 28, 1946, on the usual form, notice that it had loaned the Kungsholm Baking Company the sum of $350,000 and that it desired the protection afforded by the Blanket Participation Agreement to the extent of 75% in connection with this loan. This notice further showed that the Bank had disbursed $275,000 to the Borrower on June 27, 1946, and that the balance of the loan would be disbursed from time to time upon the Borrower's pledge of satisfactory collateral. In the blank space bearing the printed caption "Collateral: (Description and Valuation)" the Bank inserted "First mortgages on real estate valued at $492,000," without further elaboration.

The Bank regularly paid to the RFC quarterly participation fees covering this loan.

One year later, on June 27, 1947, the Borrower defaulted on the payment of principal and interest then due on the loan, the Borrower having been adjudicated a bankrupt on June 17, 1947.

Thereafter, on July 1, 1947, the Bank for the first time served on the RFC under the Blanket Participation Agreement a demand that the RFC purchase for cash a 75% participation in this loan. The RFC immediately requested that the Bank establish that the loan complied with the conditions of the Agreement.

Responding to the request of the RFC for the appraisals upon which the Bank based its valuation of $492,000 on the collateral pledged, the Bank wrote the RFC on July 8, 1947, as follows:

"We are unable to locate the appraisal of the Chicago property and believe it was destroyed in our recent fire. However, our work sheet which is still intact indicates that the Indianapolis property was listed at $369,000 and the Chicago property at $123,000 which accounts for the reported total of $492,000.

"This information was taken from a prospectus which the borrower had submitted to the SEC in connection with a proposed public stock issue."

On July 9, 1947, representatives of the RFC went to the Bank and there conferred with two vice-presidents of the Bank, Fred J. Greenebaum, who had personally negotiated the loan, and Mr. Dudley. Greenebaum died in September 1948, prior to the institution of the present law suit. The Bank ascribes to Greenebaum's death its inability to furnish evidence showing full compliance with the conditions of the Agreement respecting collateral and appraisals. However, from the letter written by the RFC to the Bank on July 10, 1947, describing the results of the conference with Greenebaum it appears that the Bank's inability to offer satisfactory evidence respecting the collateral and the appraisals was not due to its inability to produce Greenebaum as a witness. Thus, in an effort to secure the missing information, the RFC wrote the Bank on July 10, 1947, with respect to the state of the Bank's information and records concerning the collateral and its appraisal as follows:

* * * * * *

"2. The mortgage covering the Chicago property included among your collateral appears to have been executed and delivered on July 18, 1946, which is the date of the acknowledgment. In such case your bank would appear not to have had a mortgage on this real estate on the date of disbursement June 27, 1946.

"3. The mortgage covering the Indiana real estate bears date of July 1, 1946 and was not recorded until August 5, 1946. It therefore appears that your bank did not have a mortgage on the Indiana property on the date of disbursement of the loan, June 27, 1946.

* * * * * *

"5. The RFC Form L–342 which you forwarded to us described the collateral in the space provided therefor as follows:

" 'First mortgages on real estate valued at $492,000.00'

"As noted above, it would appear that you did not have the first mortgages above referred to on the date of disbursement, June 27, 1946. Messrs. Dudley and Greenebaum were unable to exhibit any appraisals substantiating the valuation of $492,000.00 mentioned in your report. You will recall that your letter to this Corporation dated July 8, 1947 acknowledged that your are unable to locate an appraisal of the Chicago property. Furthermore, the work sheet referred to in that letter which was exhibited during our conference on July 9, 1947 was taken, according to Mr. Dudley, from the Kungsholm prospectus filed with the S.E.C. in June 1946, and included a figure of some $69,-000.00 for equipment in the Indianapolis plant. As you know, the collateral did not include a chattel mortgage on that equipment. Neither Mr. Dudley nor Mr. Greenebaum was able to state during that conference whether the bank had in its possession on the date of disbursement, the photostatic copy of the letter of appraisal of Bruce Savage Company dated May 6, 1946 which Mr. Wilson transmitted in his letter of July 8, 1947.

"6. With further reference to the disbursement of the loan by your bank on June 27th, Messrs.

Dudley and Greenebaum advised us that the proceeds of the loan were disbursed by means of a cashier's check issued to the Kungsholm Baking Company on June 27, 1946, and that the cashier's check cleared on the same day. Your bank's liability ledger sheet of Kungsholm Baking Company shows an entry on November 19, 1946 indicating that on that date your bank obtained a secured note of Kungsholm Baking Company maturing on or before June 27, 1951 in the sum of $275,000.00. We are not informed what was done with the demand note of June 27, 1946 or the reason for the entry of November 19, 1946 on the liability ledger.

"We would appreciate a letter from you commenting on the above numbered paragraphs in their order and giving us such explanations as you may desire to give in connection with this transaction. This will be necessary in order that we may give consideration to the request made in your letter of July 1st."

The Bank's reply to the above letter was dated August 15, 1947. In pertinent part, it reads:

"The mortgages on the Chicago and Indianapolis properties were not physically in the bank's possession on the date of disbursement. However, there was a definite agreement between the bank and Kungsholm at the time the loan was agreed upon and disbursed that such security would be furnished immediately. As evidence of such an agreement, a trust receipt was drawn and signed by Kungsholm, reciting receipt of said two mortgages. The bank therefore had, at the time of disbursement, a valid and enforceable, equitable lien on the security which was subsequently pledged. * * *

* * * * * *

"Strict compliance with sound banking practice was impossible in this instance because of the urgent situation which the loan was designed to meet. * * *

"The figure of $492,000.00 previously reported by us as the value of the real estate is an error arising out of the following circumstances. At the time this loan was under consideration, there was before the loaning officer a preliminary draft of a registration statement prepared for the S.E.C. This registration statement showed a property valuation in Indianapolis of $369,123.09; but it included the value of the equipment. The real estate alone was valued at $20,000 for the land and $280,000 for the building.

"* * * * The bank employee in making the report in question to you misread the registration statement and assumed that the figure of $369,123.09 referred only to the Indianapolis real estate. * * *

"We are unable at this time to throw any more light on whether the bank had in its possession on the date of disbursement, a copy of the appraisal of Bruce Savage Co. Mr. Robertson, the chief loaning officer who handled this item, is deceased. The bank files do not indicate one way or the other."

The RFC was not satisfied, from the above explanations, that the loan to Kungsholm complied with the conditions of the Blanket Participation Agreement. Accordingly, the RFC refused to purchase a participation therein and this law suit was instituted by the Bank.

The loan to Kungsholm Baking Company was not secured by validly pledged collateral until the mortgages were recorded. The Illinois statutes provide, Smith-Hurd Illinois Annotated Statutes, Ch. 30, Sec. 29:

"All * * * mortgages * * shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be ad-

judged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record."

The Indiana statutes provide, Burns' Indiana Statutes Annotated, Vol. 11, Pt. 1, Sec. 56–119:

"Every * * * mortgage of lands * * * shall be recorded in the recorder's office of the county where such lands shall be situated; and every conveyance, mortgage or lease shall take priority according to the time of the filing thereof, and such conveyance, mortgage or lease shall be fraudulent and void as against any subsequent purchaser, lessee or mortgagee in good faith and for a valuable consideration, having his deed, mortgage or lease first recorded."

The mortgage on the Chicago property was recorded on July 24, 1946, and the mortgage on the Indianapolis property was recorded on August 5, 1946. There is no claim that the Chicago property had an appraised value in excess of $123,000. In these circumstances, it cannot be held that prior to August 5, 1946, the loan to Kungsholm was secured by validly pledged collateral having an appraised value in excess of the $275,000 disbursed on the loan on June 27, 1946. Until the mortgages were recorded the security for the loan was in a conjectural and hazardous position. During this period the mortgages did not constitute validly pledged collateral within the meaning of the Blanket Participation Agreement. It is apparent from the Illinois and Indiana recording statutes, above quoted, that unrecorded mortgages must give way to rights of creditors, subsequent purchasers for value, subsequently recorded mortgages and a host of other contingencies. It cannot be seriously contended that an unrecorded mortgage afforded any real security.

▪ The Bank does not contend that the security was perfected prior to its recordation. Rather the Bank argues that the date by which the perfection of the security must be completed was not the date of disbursement by the Bank but rather the date of the demand on the RFC for purchase. The language of the Agreement however requires that the security be in excess of the amounts "previously disbursed on account of such loan and the amount then to be disbursed." This language could only be met by security furnished prior to disbursement by the Bank. Throughout the Agreement the term disbursement has reference solely to a payment by the Bank. It is not contemplated that any disbursement be made by the RFC. The role of the RFC is solely that of a guarantor or purchaser. None of the money paid by the RFC at the time of a purchase is disbursed to the Borrower. Rather it is only subsequent to disbursement by the Bank that the RFC may be called upon to purchase part of the loan from the Bank. The Bank keeps the money paid by the RFC, the Bank standing in the position of a seller of the note and the RFC in the position of a buyer.

Nor would it be consistent with the purpose and plan of the Blanket Participation Agreement to construe the provision for validly pledged security as a requirement to be met only at the time a demand is made on the RFC to purchase and not at the time the Bank makes disbursements on the loan. The Bank's argument assumes that the RFC does not become involved until a demand is made upon it for a purchase. But the RFC is involved as a guarantor from the time of the making of the loan and it is therefore reasonable for it to insist on security from that time. The Blanket Participation Agreement expressly provides that "immediately" after authorizing a loan as to which the Bank desires the protection of the RFC, the Bank shall notify the RFC of the extent to which the RFC is to participate, the percentage being fixed in such amount as the Bank elects, not exceeding 75%. The participation charge paid by the Bank to the RFC begins to run at the date of the disbursement by the Bank and is figured on the amount of the disbursement. In the instant case the Bank paid the RFC

a participation charge at the rate of three-fourths of one per cent per annum on the $275,000 for the period from June 27, 1946 to July 1, 1947.

The foregoing construction of the Agreement is the only one which would be consistent with the Bank's obligations under the National Bank Act. In the instant case, the Bank would be acting illegally thereunder in making a loan of $275,000 unless the RFC was from the inception of the loan a guarantor to the extent of at least $165,000. The National Bank Act makes it illegal for the Bank to lend any one borrower in excess of $110,000 without the guaranty of the RFC as to the excess over that amount. The National Bank Act provides, 12 U. S.C. § 84, 12 U.S.C.A. § 84:

"The total obligations to any national banking association of any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund. * * * Such limitation of 10 per centum shall be subject to the following exceptions:

* * * * * *

"(10) Obligation shall not be subject under this section to any limitation based upon such capital and surplus to the extent that such obligations are secured or covered by guaranties, or by commitments or agreements to take over or to purchase, made by any * * * corporation wholly owned directly * * * by the United States: Provided, that such guaranties, agreements, or commitments are unconditional and must be performed by payment of cash or its equivalent within sixty days after demand."

It was stipulated by the parties that the above-quoted statute, as applied to

the plaintiff Bank, had the effect of limiting it to lending $110,000 to any one person.

If the Blanket Participation Agreement were construed as not requiring the securing of the loan by validly pledged collateral until the time of the demand on the RFC to purchase, the promise of the RFC to purchase a participation in the loan would not be unconditional as required by the above quoted statute. Certainly, a construction of the Agreement which contemplated the existence of an illegal loan should be avoided.

Still another statute points to the construction here placed on the Agreement. Section 5d of the Reconstruction Finance Corporation Act, as amended, provided that the RFC could only purchase securities or make loans which in the opinion of the board of directors of the RFC were "of such sound value, or so secured, as reasonably to assure retirement or repayment", Act of April 13, 1938, 52 Stat. 212. This statute is expressly applicable to arrangements such as the Blanket Participation Agreement. It provided:[1]

"For the purpose of maintaining and promoting the economic stability of the country or encouraging the employment of labor the Corporation is authorized and empowered, under such terms, conditions, and restrictions as the Corporation may determine, to make loans to, or contracts with * * *. The Corporation is further authorized and empowered to purchase the securities and obligations of, and to make loans to, any business enterprise when capital or credit, at prevailing rates for the character of loan applied for, is not otherwise available: Provided, that all such purchases of securities and obligations and all such loans shall be, in the opinion of the board of directors, of such sound

1. The language quoted is in the form in which the statute appeared in June 26, 1946. At that time it appeared in 15 U.S.C. § 606b, 15 U.S.C.A. § 606b. On June 30, 1947 the statute was amended but the language italicized was retained unchanged except for the omission of a comma after the words "of sound value" and the substitution for the semicolon after the word "repayment" of the words "and such loans". See 15 U.S.C. § 604 (b) (1), 15 U.S.C.A. § 604(b) (1).

*value, or so secured, as reasonably to assure retirement or repayment; may be made or effected either directly or in cooperation with banks or other lending institutions through agreements to participate or by the purchase of participations, or otherwise."* (Emphasis supplied)

Since the Blanket Participation Agreement contemplated that protection of the RFC be afforded loans without any prior examination into the loan by the RFC, the alternative which the statute permitted in lieu of adequate security for the loan, namely that "all such loans shall be in the opinion of the board of directors (of the RFC), of such sound value, * * * as reasonably to assure retirement or repayment," was inapplicable. Hence the provision in the Blanket Participation Agreement that the loan be secured by validly pledged collateral having an appraised value in excess of disbursements made and then to be made thereon by the Bank was required by the statute as a prerequisite to the protection by the RFC under the Agreement. The above-quoted portions of Section 5d of the Reconstruction Act, as amended, were set forth in Circular No. 25 of the RFC which the plaintiff Bank introduced in support of its construction.

The failure to record the mortgages prior to the disbursement by the Bank of the $275,000 was not the only respect in which the loan lacked validly pledged security at the time of the disbursement. While this defect was in itself such a substantial one as to render the loan ineligible for protection and purchase by the RFC, the Bank has failed to adduce credible evidence that any security of any sort was pledged prior to the disbursement of the $275,000. No documentary proof was introduced to establish that any mortgages were executed prior to July 1946. The Kungsholm Baking Company did not even have title to the Indianapolis property on June 27, 1946. In fact, the loan was made to enable Kungsholm to purchase the Indianapolis property. Sound business practice required that an escrow arrangement be used so that Kungsholm could take title, and execute and record the mortgage prior to the disbursement. Although the Bank offered oral testimony that mortgages on both the Chicago and the Indianapolis property were delivered to the Bank on June 27, 1946, there is no evidence as to who executed the mortgage on the Indianapolis property. Certainly a mortgage executed solely by officers of Kungsholm would offer no security because Kungsholm did not have title to the property.

The Bank was unable to produce either the mortgage on the Indianapolis property or the Chicago property which was allegedly delivered to the Bank on June 27, 1946. The Bank explains its inability on the ground that these mortgages recited that they were given to secure a loan of $350,000, the size of the original loan, but when later the Bank declined to disburse any funds in addition to the $275,000 disbursed on June 27, 1946, the original mortgages were destroyed and new mortgages limited to the securing of a loan in the sum of $275,000 were executed. Not only did the Bank fail to offer any documentary proof of such mortgages but all the documentary proof negatives the existence of such mortgages. The letter of Bernard G. Sang, attorney for Kungsholm, dated July 15, 1946, which transmitted the two mortgages later recorded on July 16 and August 5, 1946, respectively, is so worded as to indicate that these are the original mortgages to secure the loan. The language of the letter contains no reference to either the trust receipt under which the original mortgages were allegedly withdrawn or to the substitution of the transmitted mortgages for any prior mortgages.

If a mortgage on either or both the Chicago or the Indianapolis property were delivered to the Bank on June 27, 1946, it seems inconceivable that Fred J. Greenebaum, one of its officers, would not have so informed the RFC at the conference on July 9, 1947, or that the Bank would have written the RFC on August 15, 1947, that "the mortgages

on the Chicago and Indianapolis properties were not physically in the bank's possession on the date of the disbursement. However, there was a definite agreement between the bank and Kungsholm at the time the loan was agreed upon and disbursed that such security would be furnished immediately."

But whether or not any mortgages were delivered on June 27, 1946, in no event could the loan have been validly secured on that date by collateral appraised in excess of the disbursement on that date. This is so because the Borrower did not have title to the Indianapolis property and the Chicago property had at most an appraised value of $123,000.

Not only did the Bank fail to establish that it had any validly pledged security prior to the disbursement but it also failed to establish that it ever reasonably believed the appraised value of the mortgages it received on the Chicago and Indianapolis properties exceeded $275,000. The figure of $492,000 as the appraised value of the property which the Bank reported to the RFC on June 28, 1946 was admittedly erroneous. As the Bank explained to the RFC in its letter of August 15, 1947, some bank employee misread a preliminary draft of a registration statement prepared by Kungsholm for the S.E.C. If the Bank had an appraisal prior to June 27, 1946, it is difficult to understand why the report to the RFC dated June 28, 1946 was not based on that appraisal rather than a preliminary draft of a prospectus.

The Chicago property was appraised at $123,000. But this appraisal did not reveal the value of the interest mortgaged, for the Bank did not secure an opinion on the title of the Chicago property until August 28, 1946. This opinion showed that the Chicago property was already encumbered by a trust deed dated May 21, 1941 and recorded May 26, 1941 to secure a note for $20,000. The opinion of title also disclosed the existence of litigation against Kungsholm which constituted a further encumbrance on the title. The dictates of ordinary business practices required that the Bank have title insurance or an opinion of a title company before it could be said that it reasonably believed that the interest mortgaged actually had the value at which the full property was appraised. Without any title insurance or opinion on title the Bank could not reasonably have believed that the interest mortgaged had an appraised value of $123,000.

The record does not reveal the amount of money which the Chicago Title and Trust Company required Kungsholm to deposit with it as protection against claims on the outstanding trust deed. However, it was stipulated that the Trust Company required a $10,000 deposit as protection against liens arising from pending litigation before it would waive that defect in title. Although the deposit resulted in the issuance of title insurance thereby placing the full Chicago property behind the mortgage, nevertheless in that process Kungsholm's total funds were diminished. The Borrower therefore did not have available for the intended business use the amounts which it and the Bank contemplated. The unforeseen requirement that either part of the proceeds of the loan or other funds be used to clear title to the collateral necessarily reduced the ability of the Borrower to repay the loan.

Normally it can be inferred that a bank which disburses funds on the basis of an appraisal of the collateral pledged has a reasonable belief that its value exceeds the disbursement. In the instant case where the Bank disbursed funds first and only thereafter obtained security, no such inference can be drawn. The record contains no evidence to support any finding that the Bank ever had any reasonable belief that the mortgages it ultimately received on the Chicago and the Indianapolis property had an appraised value in excess of $275,000.

The provision of the Blanket Participation Agreement that the loan should be secured by validly pledged collateral having an appraised value which the Bank reasonably believed to be in excess of the disbursement then to be made is a condition precedent to any obligation

upon the part of the RFC to purchase a participation in such loan. This form of Blanket Participation Agreement has been before two other United States District Courts. In each instance it was held that the provisions defining the type of loans eligible for protection and fixing the conditions for purchase were conditions precedent to any obligation by the RFC to purchase a participation. In so holding the court in First Nat. Bank of San Mateo County v. R. F. C., D.C. N.D.Cal.S.D.1953, 123 F.Supp. 620, 622, said:

"A bank who brings an action against the Reconstruction Finance Corporation for breach of a 'Blanket Participation Agreement' has the burden of proving that it has performed all conditions precedent to the liability of Reconstruction Finance Corporation. Oklahoma National Bank v. R. F. C., D.C.W.D. Okl., 127 F.Supp. 156, No. 4717, Sept. 30, 1950. Plaintiff has here failed to sustain such burden of proof. It is a condition precedent to the liability of defendant to purchase participation in a loan that such loan comply with the requirements set out in Paragraph 2 of the 'Blanket Participation Agreement.' The Britschgi loan does not comply with such requirements because: (1) it does not mature within ten years from the date of the first disbursement made under the loan; and (2) one of the instruments of indebtedness evidencing the loan bore interest at a rate in excess of four percent per annum."

In that case it further appears from the unreported findings of fact and conclusions of law that the court held that a failure to record a chattel mortgage in the proper county prevented the mortgage from constituting "validly pledged collateral" within the meaning of Paragraph 3(c) of the Blanket Participation Agreement. In this respect the court found:

"On April 30, 1946, plaintiff disbursed $17,280.00 on the loan and took as collateral securing such indebtedness a chattel mortgage executed by Britschgi on certain cattle and milking equipment located in Santa Clara County, California, and appraised by plaintiff at $18,000.00; on May 14, 1946, when the unpaid balance of the loan was $17,280.00, plaintiff disbursed an additional $109,717.20 and took as collateral securing $57,999.60 thereof, a chattel mortgage executed by Britschgi on certain dairy, fountain and garage equipment located in said Santa Clara County, and appraised by plaintiff at $61,304.00; other collateral taken at the time of the second disbursement on the loan, as aforesaid, was not appraised by plaintiff at a value in excess of the then unpaid balance of the loan and the amount then to be disbursed; on the said dates, Britschgi resided, and still resides in San Mateo County, California, which fact was then known to plaintiff; each of the said chattel mortgages was recorded in the official records of the said Santa Clara County, on the dates of April 30 and May 14, 1946, respectively; neither of said chattel mortgages was ever recorded in the said San Mateo County; neither of said Chattel mortgages was recorded in the manner specified in Section 2957 of the California Civil Code, and therefore such collateral did not at any time constitute 'validly pledged collateral' within the meaning of subdivision (c) of paragraph 3 of the BPA, hereinabove set forth in Finding VIII; in acting as described in this Finding, plaintiff failed to comply with said subdivision."

And as its conclusions of law the court stated:

"The provisions of paragraphs 2 and 3 of the BPA, described and set forth in Finding VIII above, were conditions precedent, all of which plaintiff was required by the BPA to perform and comply with before defendant had any duty to purchase participation in the loan, or became liable in any way for failure to pur-

chase such participation upon request of plaintiff.

"The burden of proving performance of and compliance with the said conditions precedent of the BPA rested on plaintiff, and plaintiff failed to sustain such burden of proof."

In the case of Oklahoma Nat. Bank v. RFC, No. 4717, D.C.W.D.Okl.1950, 127 F.Supp. 156, the court held that the RFC had not breached the Blanket Participation Agreement by refusing to purchase a participation where the loan did not meet the conditions of Paragraph 3(e) of the Agreement heretofore quoted in that proceeds of the loan had been used to discharge a prior indebtedness to the Bank. The court held that the conditions set forth in Paragraph 3 were conditions precedent and that the Bank had the burden of proving full compliance with these conditions.

 If, however, the plaintiff Bank were correct in its argument that the provisions of Paragraph 3(c) of the Blanket Participation Agreement are not conditions precedent but rather constitute promises by the Bank, the RFC is still excused from purchasing. For the promise by the Bank to take validly pledged security of requisite value prior to making the disbursement, was breached by it. The breach was a substantial one and contributed to the loss which the Bank now asks the RFC to assume to the extent of 75%. If the Bank had obtained opinions of title, appraisals and valid mortgages prior to making any disbursement, it seems most unlikely that it would have disbursed $275,000 to the Kungsholm Baking Company without additional security. The absence of these precautions, dictated both by sound business practice and Paragraph 3(c) of the Participation Agreement was a substantial factor in the loss it suffered. The RFC did not contract to share in any loss so caused.

The plaintiff Bank has argued at length that the whole purpose of the Blanket Participation Agreement was to avoid the usual red tape and technicalities which the RFC now insists should have here been followed. The terms of the Agreement however clearly require appraisals and valid pledging of collateral prior to disbursements. Such a requirement is not a mere technicality. If the security follows the disbursement the lender may be unable to secure as much security as it could have secured prior to the disbursement. A borrower who already has the funds in hand is much less willing to provide security than the prospective borrower. Likewise the size of a loan or disbursement is often smaller when the lender realizes, by already having in hand the security, that its worth is less than the prospective borrower represented. If the money is advanced first and security taken later the lender is not in a position to drive as good a bargain for adequate security.

Moreover, in the instant case the unusually large size of the loan should have caused the Bank to exercise a high degree of care in securing it with valid collateral well in excess of the loan. Not only was the loan to Kungsholm more than twice as large as the legal limits on the Bank's lending power, but even by RFC precedents it was an exceptionally large loan. Of the $3,000,000,000 which the RFC had loaned to business enterprises prior to June 1946, "about one third of the 24,000 business loans authorized were made to the businessman who needed $5,000 or less. Another sixth of the total went to small businessmen needing $5,000 to $10,000. Loans of $25,000 or less made up about two-thirds of the total. Ninety per cent of all business loans authorized were under $100,000."[2] In March 1945 when the Blanket Participation Agreement was first announced the maximum loan eligible for protec-

2. Statement of Charles B. Henderson, then Chairman of the Reconstruction Finance Corporation, June 23, 1946, Hearings before the Select Committee to Conduct a Study and Investigation of the National Defense Program in its Relation to Small Business in the United States, House of Representatives, 79th Cong., 2d Sess., on H.Res. 64, Pt. 6, p. 1688.

tion thereunder was $250,000. All the copies of the standard form Blanket Participation Agreement which appear in the record here, as well as the RFC Circular No. 25, above mentioned, have printed in the figure of $250,000 as the maximum loan, with the figure $350,000 stamped over the printed figure. Subsequent to March 1945 and prior to June 1946 the limit was enlarged from $250,000 to $350,000, not because such sizable loans were usual, but because the RFC wanted to avoid having to make exceptions.[3] The negligent manner in which the Bank here handled the securing of such a sizable loan as $275,000 deprives it of any basis, whether judged by legal standards or by sound business practice, for shifting 75% of the loss to the RFC.

There will be a finding of the issues in favor of the defendant and against the plaintiff. The findings of fact and conclusions of law hereinabove set forth will be considered the findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.

Judgment will be entered for the defendant with costs against the plaintiff.